UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER


TERESA M. BEUMER,                    )
                                     )
            Plaintiff,               )
                                     )
                                     )        No. 4:09-CV-33
v.                                   )
                                     )        *Mattice / Lee*
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
            Defendant.               )


## REPORT AND RECOMMENDATION


Teresa M. Beumer ("Plaintiff") brings this action under 42 U.S.C. §§ 402(g) and 1383(c)(3)

seeking judicial review of the final decision of the Commissioner of Social Security

("Commissioner" or "Defendant") denying Plaintiff disability insurance benefits ("DIB") and social

security insurance ("SSI") benefits.  Specifically, Plaintiff challenges the decision of an

Administrative Law Judge ("ALJ") on three grounds: (1) that the ALJ erred in finding she did not

have a "severe" mental impairment, (2) that the ALJ improperly weighed the medical opinions by

discounting the opinions of Plaintiff's treating physicians and leaning too heavily on the opinion of

a consultative examiner, and (3) that the ALJ erred in finding her testimony was not credible.  For

the reasons stated below, I **RECOMMEND**: Plaintiff's motion for summary judgment [Doc. 17]

be **DENIED**; Defendant's motion for summary judgment [Doc. 19] be **GRANTED**; the decision

of Commissioner be **AFFIRMED**; and this action be **DISMISSED WITH PREJUDICE**.

## I.     ADMINISTRATIVE PROCEEDINGS

For over ten years, Plaintiff's claim has languished in various stages of administrative

review, and she now appeals for the first time to this Court.  Plaintiff filed her application for DIB

and SSI benefits in March, 2000 (Tr. 85-86, 448-50).  Her chief complaint was back pain, which she

described as radiating into her legs, and she reported having "pain block" treatments and taking

prescription medications to control it  (Tr. 102-15).  Plaintiff also alleged disability due to carpal

tunnel syndrome and depression (Tr. 464).  According to Plaintiff, she stopped working on

December 21, 1999, her alleged onset date, because the "[p]roblems from [her] conditions made

[her] have to quit" (Tr. 103).  Plaintiff's claim was denied initially and on reconsideration, and she

requested a hearing before an Administrative Law Judge ("ALJ") (Tr. 59, 61, 71).

That hearing (the first of three) was held on January 15, 2002, before ALJ Robert Haynes

(Tr. 463-67).  At the time of the hearing, Plaintiff was 36 years old (Tr. 463).  ALJ Haynes found

Plaintiff suffered from two severe impairments: lumbar spinal disc disease and obesity.  He declined

to credit Plaintiff's testimony, and he found she retained the residual functional capacity ("RFC")

to perform a limited range of light and sedentary work (Tr. 466).  On those findings, Plaintiff was

not disabled (Tr. 467).[1]  Plaintiff had been proceeding pro se,[2] but she employed an attorney to assist

---

[1] The Social Security Administration ("SSA") determines eligibility for disability benefits
by following a five-step sequential evaluation process, 20 C.F.R. § 404.1520(a)(4)(i-v), which is
described below, but only the most relevant findings are reported in this summary.

[2] Plaintiff sought representation from a non-attorney representative, but the representative
withdrew prior to the first hearing with no explanation and failed to inform Plaintiff she had done
so (Tr. 1897-98).

her after the unfavorable decision was issued (Tr. 468). A year and a half after the ALJ issued his opinion, the Appeals Council vacated ALJ Haynes' decision and remanded the case for another hearing (Tr. 467, 470-73).[3] The Appeals Council's letter of remand explained that ALJ Haynes' decision was deficient in three respects: (1) it found no severe mental impairments despite a diagnosis of and treatment for major depression; (2) it inadequately considered several factors affecting the evaluation of Plaintiff's credibility; and (3) it did not sufficiently explain the RFC finding (*id.*). The letter instructed the ALJ to remedy these deficiencies, to consider new evidence submitted by Plaintiff, and to obtain additional evidence as needed (*id.*). The record was subsequently augmented by a number of medical records and two new consultative examinations (Tr. 480-1163).

Plaintiff's second hearing was conducted by ALJ Robert Erwin in March, 2005, five years after she filed her application (Tr. 1164-75). ALJ Erwin added two physical impairments to Plaintiff's list of severe impairments, viz., status post arthroscopic right knee surgery and asthma (Tr. 1171). In addition, in apparent response to the Appeals Council's suggestion, ALJ Erwin found Plaintiff suffered from a severe mental impairment, viz., depression (*id.*). ALJ Erwin also assessed a slightly more restrictive RFC than was assigned by ALJ Haynes: he concluded she could perform only a reduced range of sedentary work (Tr. 1172). Like ALJ Haynes, however, ALJ Erwin found Plaintiff's testimony was not credible. He concluded her complaints of disabling pain appeared "exaggerated" as compared to her statements to doctors (Tr. 1172) and determined she was not disabled (Tr. 1175). Plaintiff again requested review by the Appeals Council, and in February, 2006,

---

[3] It appears 60 days of this delay was attributable to Plaintiff's request for more time (Tr. 468).

the Appeals Council again vacated the ALJ's opinion and remanded for further proceedings (Tr. 1176, 1178). The Appeals Council explained that ALJ Erwin's decision was not supported by substantial evidence because: (1) it did not address whether Plaintiff required an assistive device for ambulation, and (2) it did not adequately explain how Plaintiff's mental limitations affected her RFC (Tr. 1179).

Plaintiff's most recent hearing was held in June, 2007, again before ALJ Erwin, and a decision was issued in January, 2008 (Tr. 22-28). ALJ Erwin found, among other things, that Plaintiff did *not* have any severe mental impairments after all (Tr. 23). Also significant here, ALJ Erwin found, for a second time, Plaintiff's subjective complaints were not credible (Tr. 24). He concluded Plaintiff retained the RFC to perform sedentary work, with additional postural and environmental limitations, and she required a walker to ambulate (Tr. 25). The ALJ then relied on the testimony of a vocational expert ("VE") to find that there were significant numbers of jobs Plaintiff could perform (Tr. 26), and she was therefore not disabled (Tr. 27). Although Plaintiff again requested review by the Appeals Council, the Council declined her request, and ALJ Erwin's decision became the final, appealable decision of the Commissioner (Tr. 11-13). Plaintiff now appeals to this Court.

## II.     ELIGIBILITY FOR DIB

The Social Security Administration ("SSA") determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v).

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work

activities-the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). Between steps three and four, the ALJ assesses the claimant's residual functional capacity ("RFC"). *Id.* at 653. The claimant bears the burden to prove the severity of her impairments, but the burden shifts to the Commissioner at step five to show there are jobs she can perform despite her impairments. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

## III.    FACTUAL BACKGROUND[4]

Plaintiff was 41 years old when ALJ Erwin penned his most recent hearing decision (Tr. 28, 86). She is a single parent who completed high school and attended one year of college (Tr. 1900). She has work experience as a cashier, cook, waitress, meat wrapper, and nurse's aid (Tr. 116). Most of these jobs she performed only a short period of time, and she was employed longest as a cashier for Big Lots from 1994 to 1996 (*id.*). Her primary complaint is back pain (Tr. 1524), but she has also received treatment for various other complaints.

---

[4] The administrative record in this case is voluminous, and this summary cannot capture all the evidence. The entire record, however, has been reviewed with care.

### A.     Plaintiff's Treatment History

#### 1.     Pre-Onset History

In 1989 or 1990, Plaintiff was involved in a car accident and was subsequently diagnosed with reflex sympathetic dystrophy ("RSD") by Katheryne Guggenheim, M.D., a neurologist (Tr. 123, 481, 483).  Dr. Guggenheim opined in 1991 she was "incapacitated to work" due to RSD, but this was not a permanent disability (Tr. 483, 490).  Plaintiff later reported that Dr. Guggenheim told her she "would never be able to work again." (Tr. 233).  Dr. Guggenheim noted Plaintiff was "remarkably level headed" and "reasonably intelligent and goal directed" (Tr. 487).  Several months later, Douglas Haynes, M.D., observed that Plaintiff showed no neurological deficit and opined she was not suffering from RSD (Tr. 511).  He performed a bone scan and detected mild degenerative joint disease of the left knee (Tr. 514).  In April, 1992, Dr. Haynes noted Plaintiff was not working, but opined she could return to work if a job were available (Tr. 509).  Plaintiff did begin working again, apparently in 1993, and she had no prolonged periods of unemployment until December, 1999, when she alleged her disability began (Tr. 116-17).  Plaintiff told a consultative examiner that she had been diagnosed with severe degenerative arthritis of the left knee, for which she received arthroscopic surgery in 1993 (Tr. 1071).  It does appear Plaintiff received left knee surgery at some point (e.g., Tr. 521, 524).

#### 2.     Spine Impairments and Radiating Pain

In November, 1999, Plaintiff presented with complaints of back pain (Tr. 182).  Wendell Mcabee, M.D., examined her, and x-rays showed a normal lumbar spine with disc spacing "satisfactorily maintained" (Tr. 182).  Plaintiff was referred to a physical therapist, who noted that Plaintiff was "unable to tolerate any activity or modality" of therapy--even massage (Tr. 728, 738).

The therapist also stated, however, that Plaintiff "appear[ed] to magnify symptoms": she "jump[ed] and moan[ed]" from touching, even without pressure (Tr. 741). Plaintiff's low back pain persisted, along with radiating leg pain, and she was seen by James Nunley, D.O. in early 2000 (Tr. 204, 207). During his examination, Dr. Nunley noted Plaintiff was "somewhat evasive and appeared to be a very poor historian" regarding previous evaluations (Tr. 207). Dr. Nunley performed a variety of tests and a "diagnostic" epidural block was performed in February, 2000, shortly followed by two more epidural blocks (Tr. 204). Plaintiff's response to the epidurals was "less than satisfactory" and Dr. Nunley concluded she was not a candidate for additional blocks (Tr. 197, 258).

In April, 2000, an MRI showed a "significant broad based disc bulge at two levels." (Tr. 196, 208). Dr. Nunley referred Plaintiff to Paul McCombs, M.D., for a neurosurgical consult (Tr. 196, 260). Dr. McCombs believed that surgery was not appropriate because there was no evidence of nerve root compromise from a myelogram and CT scan (Tr. 231). Dr. McCombs referred Plaintiff back to Dr. Nunley for conservative treatment (*id.*). In February, 2001, Plaintiff reported that a combination of Vioxx and baclofen "adequately controlled her discomfort," but she still experienced episodes of "immobilizing" pain (Tr. 257). Dr. Nunley advised Plaintiff that he believed if she could lose 50 to 75 pounds, her discomfort would significantly decrease, but he was "not overly optimistic" that she would be able to do so (Tr. 258). He also recommended physical therapy for muscle strengthening (Tr. 260). Plaintiff reported in April, 2001, she was unable to do physical therapy because it made her pain worse (Tr. 307).

In March, 2001, an MRI showed Plaintiff had a lumbar disc bulge with moderate degenerative spinal stenosis, but an April, 2001, MRI showed neither (Tr. 813). Daniel Lalonde, Plaintiff's neurologist, was at a loss to explain the discrepancy (*id.*). In May, 2001, Dr. Lalonde

performed an electrodiagnostic study which revealed no evidence for lumbar radiculopathy, myopathic process, or peripheral neuropathy (Tr. 306). Plaintiff continued, however, to have bilateral leg pain and numbness (*id.*). Dr. Lalonde felt Plaintiff's prognosis was "poor" given the diffuse nature of her back pain (Tr. 308). In September, 2001, Brad Blankenship, M.D., treated Plaintiff for back pain accompanied by leg pain, numbness, and weakness (Tr. 270). He found moderate degenerative spinal stenosis, with degenerative disc disease, of the L4-5 disc and mild degenerative spinal stenosis of the L3-4 disc (*id.*). Because of Plaintiff's persistent complaints, he recommended another myelogram (*id.*). Dr. McCombs performed such a study in November, 2001, and again found no evidence of nerve root compromise (Tr. 291, 293-94). According to Dr. McCombs, continued conservative treatment was indicated (Tr. 291).

On referral from Dr. Blankenship, James E. Roth, M.D., treated Plaintiff for pain (Tr. 844-82). In a physical examination, he noted "marked muscle spasm" and diminished sensation, or "light touch" (Tr. 854-55). Dr. Roth opined that Plaintiff "certainly qualifie[d] for disability" (Tr. 850), and stated she was "unable to tolerate physical therapy or a myelogram" (Tr. 856).

In August, 2004, Plaintiff complained of back, hip, and foot pain (Tr. 1111-15). X-rays of the lumbar spine revealed no significant bony abnormality or malalignment, and disc spacing was "satisfactorily maintained." (Tr. 1111). Hip and foot x-rays showed no significant bone or soft tissue pathology (Tr. 1112, 1114, 1115). In July, 2005, she was seen by Sekou Molette, M.D., who stated Plaintiff was doing exercises regularly and was "[r]eally doing well. Better than she thinks[,] though she admits she is getting around much better." (Tr. 1390). Several months prior, Dr. Molette had noted that Plaintiff's back and leg pain had improved with medication, muscle relaxants, and lying down (Tr. 1395). Dr. Molette opined that weight loss was "a must" and advised Plaintiff to

continue using a rolling walker (Tr. 1391). Plaintiff reluctantly agreed to an in-home exercise program, stating her only exercise was "walking her cat around the house." (Tr. 1393). Still under Dr. Molette's care, Plaintiff had a lumbar x-ray and MRI in May, 2005, both of which showed mild degenerative disc disease at multiple levels (Tr. 1443-44).

In January, 2006, Dr. Molette reported Plaintiff was "really doing well" (Tr. 1512), but in May, Plaintiff again reported back pain radiating into her leg (Tr. 1510). MRIs taken that month showed only mild degenerative disc disease of the lumbar spine (Tr. 1516-17). In November, 2006, despite continued complaints of back pain, Dr. Molette reported Plaintiff was "[a]ctive at home" and "[i]ndependent with the medication regimen" (Tr. 1506). Dr. Molette also noted she was a candidate for pain management and her son needed to help her more at home (*id.*). In 2007, Dr. Molette continued to treat Plaintiff for back pain (Tr. 1823-24).

Plaintiff has also been diagnosed with minor degenerative changes of the cervical spine (Tr. 1035, 1468). Because she complained of radiating pain in her arms and legs, Dr. Blankenship referred Plaintiff to Dolores Salibay, M.D., who performed electromyographic studies to identify evidence of radiculopathy (Tr. 1456). No such evidence was found with respect to either her lumbar or cervical spine (Tr. 1458).

### 3.     Lower Extremity / Knee Impairments

In October, 2001, Plaintiff was treated in the emergency room after her right leg "froze" and/or "buckled" (Tr. 558). In December, 2001, Plaintiff received an MRI of her right knee, which revealed no evidence of trauma or internal derangement (Tr. 297). Nonetheless, after she failed to respond to conservative treatment, Plaintiff chose to undergo arthroscopic surgery on her right knee (Tr. 799-801). Plaintiff was scheduled for right knee surgery in January, 2002 (Tr. 317). Laurence

Schwartz, M.D., performed an arthroscopic surgery in February, 2002, and repaired a torn meniscus that had not been visible on the MRI (Tr. 807). He also performed a "lateral release" so that her kneecap would track correctly (*id.*). Later that month, Dr. Schwartz opined Plaintiff could not work "at th[at] time" (Tr. 447, 884). He declined to give a medical source statement in February, but stated he would be happy to do so after Plaintiff reached a "plateau of maximum medical improvement." (Tr. 884). He gave such a statement in September, 2002, described below (Tr. 840-43).

After her surgery, Plaintiff was referred for physical therapy with the understanding that if a strengthening regimen did not resolve her problems, it might be necessary to attempt a "more extensive patella realignment procedure" (Tr. 808). Plaintiff was also given a referral for a walker "due to difficult ambulation" (Tr. 795). In November, 2002, Plaintiff was noted to be "using walker due to right knee problem." (Tr. 745). The following month, James Roth, M.D., a pain management specialist, observed she was still using the walker and he recommended an electric wheelchair (Tr. 844-45). In January, 2003, Plaintiff reported her "left knee [was] better, and her right knee [was then] recovering." (Tr. 772). Plaintiff continued to use the walker throughout 2004 and in 2005 and 2006 (*e.g.*, Tr. 958. 1288, 1390, 1394, 1508). In July, 2005, Dr. Molette stated her gait was "tenuous" even with the walker (Tr. 1514). Plaintiff reported she could not use her electric wheelchair because her apartment was not handicap accessible (Tr. 1322). With the walker, Plaintiff was able to transition from sitting to standing independently (Tr. 1394). Nonetheless, she reported falling on several occasions (*e.g.*, Tr. 1507, 1508, 1592, 1689, 1828).

Tests performed in December, 2006, showed no fractures, dislocations, or other abnormalities of Plaintiff's right knee (Tr. 1532), but similar tests in March, 2007, showed

degenerative changes in both the medial and lateral compartments of her knee with scalloping of the patella (Tr. 1563). Those degenerative changes were characterized as "mild" (*id.*).

Beginning in November, 2006, Plaintiff received home health services addressing a variety of treatment goals, including her abnormal gait and unsteady standing balance (Tr. 1674, 1705). Tonya Pedigo-Price, RN, described her "rehabilitative prognosis"--i.e., the "best description of [her] prognosis for functional status"--as "guarded," with minimal improvement expected and decline possible (Tr. 1703).[5] Assessing Plaintiff's condition, Ms. Price stated pain interfered with Plaintiff's activities daily, but not constantly, and the pain was not intractable (Tr. 1706). Plaintiff had decreased leg strength (Tr. 1705) and lost her breath with minimal exertion--e.g., while eating or talking (Tr. 1708). It was a "taxing effort" for Plaintiff to leave her home unassisted (Tr. 1738). Dr. Molette noted in January, 2007, similarly, that her gait was "labored" with the walker (Tr. 1828). Still, Plaintiff was able to ambulate safely with an assistive device or human supervision and could go shopping with assistance (Tr. 1711-12, 1769). In 2007, Plaintiff still complained of bilateral knee pain (Tr. 1824).

### 4.       Other Physical Complaints

In June, 1999, Plaintiff was diagnosed with borderline to mild carpal tunnel syndrome in her right extremity after complaining of numbness and tingling (Tr. 141). Electrodiagnostic studies in May, 2001, showed mild carpal tunnel syndrome of both hands (Tr. 306). Nerve conduction studies performed in March, 2005, however, were essentially normal (Tr. 1456). Plaintiff also complained of shoulder pain, but testing in July, 2006, showed her shoulder was normal (Tr. 1562). Further

---

[5] On a form completed the same day, Plaintiff's prognosis was marked as "excellent," but there was no explanation of that assessment (Tr. 1674).

testing in December, 2006, showed evidence of bursitis, but was otherwise negative (Tr. 1831). Plaintiff told her mental health treatment provider that she broke her ankle in October, 2005 (Tr. 1322), but the treatment notes show it was merely twisted (Tr. 1494-97). In September, 2006, Plaintiff told her therapist she had been diagnosed with fibromyalgia, although no treatment records are in the record to substantiate that claim (Tr. 1578).

In May, 2001, Fuad Zeid, M.D., found Plaintiff had a "mild restrictive impairment" with possible bronchial asthma (Tr. 826). Dr. Zeid stated she was "unable to work" due to that condition (Tr. 244). Plaintiff has been diagnosed with diabetes mellitus (Tr. 1049). A physical exam performed in May, 2004, revealed loss of protective sensation in both feet and painful onychomycosis with pain and paresthesias (Tr. 928). She received a prescription for diabetic shoes (*id.*). Plaintiff's blood sugar is adequately controlled with medications (Tr. 1870-71). Finally, Plaintiff was obese (Tr. 1391), had hypothyroidism and hypertension (Tr. 1283), and received treatment for headaches (e.g., Tr. 1550).

### 5.      Mental Health Treatment

Dr. Lalonde, who treated Plaintiff in December, 2001, for complaints of headache, reported that Plaintiff "denie[d] any feelings of depression," but Dr. Lalonde suspected she had "a lot of anxiety" (Tr. 303). Similarly, Keith Lovelady, M.D., noted she "look[ed] depressed" in June, 2002 (Tr. 814). Dr. Roth observed she had a "depressed affect" in December, 2002 (Tr. 846).

In early 2002, Plaintiff sought treatment from CHEER Mental Health Center for anxiety, mood swings, and trouble sleeping (Tr. 791). She also reported having trouble with her son at home (Tr. 789). Plaintiff was diagnosed with agoraphobia (without history of panic disorder), "moderate"

limitations, and was assigned a global assessment of functioning ("GAF") score of 55[6] (Tr. 788-89). Plaintiff was unemployed at the time and she reported she was seeking disability and had no interest in becoming employed or enhancing her job skills (Tr. 786). She reported several stressors: her health, frustration that her doctors did not believe there was anything wrong with her back (Tr. 772). Plaintiff was found to be "reliable" in reporting her problems (Tr. 771), and she was diagnosed with major depressive disorder, single episode, moderate, and was prescribed Paxil (Tr. 768, 775).

In April, 2002, Plaintiff was assigned a GAF score of 60 and her depression was described as "mild" (Tr. 768). In May, 2002, a mental health professional noted Plaintiff was seeing a counselor (Tr. 764), but Plaintiff's attendance of her therapy sessions was irregular at best (*e.g.*, Tr. 742-44, 922-27, 1151-59, 1567-1602).[7] During counseling sessions, Plaintiff reported she was sometimes "in a lot of pain" and did not get out of bed some days (Tr. 760). In a psychiatric evaluation dated July, 2002, Rosalia Dominguez, M.D., noted Plaintiff's stressors were medical problems and family issues (Tr. 756). Dr. Dominguez observed that Plaintiff "appear[ed] to be sad looking, tearful, when talking about her medical issues, family and financial." (Tr. 757). Plaintiff was "highly encouraged" to continue with counseling, and her Paxil dose was increased (Tr. 754). Her GAF score was 55 (*id.*).

In August, 2003, Plaintiff's GAF score improved to a 62, although she reported she was still

---

[6] A GAF score between 41 and 50 corresponds to a "serious" psychological impairment; a score between 51 and 60 corresponds to a "moderate" impairment; and a score between 61 and 70 corresponds to a "mild" impairment. *Nowlen v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 718, 726 (E.D. Mich. 2003).

[7] Some of Plaintiff's missed appointments appear related to her or her son's medical needs or her transportation difficulties (e.g., Tr. 1157, 1158, 1570). Many, however, are unexplained (e.g., Tr. 1147).

"down at times" and she was "somewhat sad when she was talking about family issues [and] medical problems" (Tr. 917). In October, 2003, however, Plaintiff stated she was more depressed and anxious because she had been battling with her 11-year old son (Tr. 913). In April, 2004, Plaintiff reported she "continue[d] to have problems with her son and his conduct" (Tr. 902). Her GAF score had dropped to 57 (Tr. 1135), where it remained in June, 2004 (Tr. 906). At that time, the treatment narrative stated Plaintiff had a history of "significant episodes of depression and increased anxiety with continued need for medication monitoring" (*id.*).

Plaintiff's difficulties with her son continued in 2004. She told her therapist in May, 2004, that her son hit her and cussed at her, and he had recently been put on probation for shoplifting (Tr. 1157). She was also afraid that if she lost custody of her son, she would lose her housing and her income (*id.*).[8] In July, 2004, after Plaintiff missed the previous month's appointment, a case management worker, Martha Nichols, visited Plaintiff in her apartment (Tr. 1156). Plaintiff reported she could not walk down the steps of her apartment with a walker and needed a wheelchair ramp (Tr. 1156). A week later, during another home visit, Ms. Nichols noted that Plaintiff fell asleep several times and appeared to be overmedicated (Tr. 1153). Ms. Nichols also observed that Plaintiff had not been keeping up with housework, and Plaintiff told her she was unable to do so because of her physical health (*id.*). She was receiving help from her family with laundry: her brother picked up the laundry and returned it after her mother did the washing (Tr. 1138). In mid-2004, Plaintiff was on the waiting list for housekeeping services from the human resource agency (Tr. 1146), but in August, 2005, she had been approved for housecleaning help and meals on wheels (Tr. 1326).

In December, 2004, Plaintiff again reported chronic stress due to her relationship with her

---

[8] Plaintiff was reportedly living on child support, AFDIC, and food stamps (Tr. 1153).

son (Tr. 1263). Plaintiff continued to experience moderate depression (*id.*). Plaintiff's treatment notes follow largely the same pattern throughout 2005 and 2006 (*e.g.*, Tr. 1265, 1326), but in June, 2005, Plaintiff's diagnosis was modified from major depressive disorder, single episode, moderate, to "major depressive disorder, *recurrent*, moderate" (Tr. 1345) (emphasis added). In June, 2006, her GAF score fell to 50 after the death of a cousin, and her affect was "blunted" (Tr. 1354). In March, 2007, Plaintiff's GAF score rose to 55 (Tr. 1610), which is the last reported score in the record. That month, Plaintiff was treated for the first time by a new physician, who characterized her mental health treatment as "complex" and "compromise[d]" by her physical ailments (Tr. 1609). Two months later, Plaintiff told her therapist her depression was "not great," with "good days and bad days." (Tr. 1600).

It appears Plaintiff's anxiety had some physical manifestations. Plaintiff reported to her therapist during 2002 that she "got the shakes" and she slept poorly (Tr. 756, 758). She was prescribed Ambien for insomnia (Tr. 1262). In addition, in April, 2002, Plaintiff's neurologist, Dr. Lalonde, reported that Plaintiff was suffering from "intractable cervicogenic chronic daily headache[s]," despite having been given greater occipital nerve blocks three months prior (Tr. 811-12). Dr. Lalonde stated those headaches were caused by many factors, but had a "strong psychosocial component." (Tr. 811).

### B.    Medical Opinions

#### 1.    Physical Assessments

The record contains several medical assessments of Plaintiff's functional capacity, spanning from 2000 to 2006. The first, in May, 2000, was completed by a consultative examiner, H.T. Lavely, M.D. (Tr. 222-29). Dr. Lavely opined Plaintiff could lift 20 pounds occasionally and ten

pounds frequently, and could stand/walk and sit for about six hours in an eight-hour workday (Tr. 223). Dr. Lavely offered no postural or environmental limitations (Tr. 224, 226). Two months later, Louise Patikas, M.D., reviewed Plaintiff's file and offered a less restrictive assessment. According to Dr. Patikas, Plaintiff could lift 50 pounds occasionally and 25 pounds frequently (Tr. 237). Dr. Patikas based her assessment on an MRI that showed no stenosis and a myelogram that showed no nerve root compression (*id.*).

In December, 2001, Dr. McCombs submitted a treating source statement (Tr. 286-90). He opined Plaintiff could lift 20 pounds occasionally and less than ten pounds frequently, and she could stand/walk at least two hours and could sit less than six hours in an eight-hour workday (Tr. 286-87). Dr. McCombs also offered some postural limitations: Plaintiff could only occasionally climb, balance, kneel, crouch, or stoop, and she could never crawl (Tr. 287). He offered a single environmental limitation: Plaintiff was to avoid hazards such as machinery and heights (Tr. 289).

Dr. Schwartz provided a treating source statement in September, 2002, which is of some significance here (Tr. 840-43). He opined Plaintiff could lift less than ten pounds occasionally and could lift no amount of weight frequently (Tr. 840). She could stand/walk less than two hours and sit less than six hours in an eight-hour workday (Tr. 840-41). She could occasionally balance, but could never climb, kneel, crouch, crawl, or stoop (Tr. 841). In addition, she was to avoid temperature extremes, vibration, hazards, and fumes (Tr. 843).

Emelito Pinga, M.D., performed a consultative examination in August, 2004 (Tr. 1070-78). He noted she gave "good effort" during the examination and she was a reliable historian (Tr. 1073-74). She used her walker to transfer from the chair to the examining table (Tr. 1074). During the exam, Dr. Pinga noted that Plaintiff's knees did not show any inflammation or effusion, but there

was some crepitus in the right knee (Tr. 1075).  Plaintiff's gait with the walker was within normal limits, but was slowed due to her obesity (*id.*).  In a narrative assessment, Dr. Pinga opined Plaintiff could sit six hours and stand/walk four hours, with a walker, during an eight-hour day (Tr. 1077).  With respect to lifting, he stated, "[t]here would be severe limitations in any frequent lifting of 5 to 10 pounds or occasional lifting of 15 pounds." (*Id.*).  Dr. Pinga also completed a form which differed in some respects from his narrative assessment.  He stated Plaintiff could stand/walk about six hours and noted she "she uses walker in the office for ambulation," but he did not indicate that a medically required hand-held assistive device was "necessary for ambulation" (Tr. 1079).  Dr. Pinga checked the box indicating Plaintiff could lift 10 pounds occasionally, but did not indicate that Plaintiff could lift any amount of weight frequently (*id.*).  He also indicated Plaintiff could only occasionally perform postural activities and offered several environmental limitations (Tr. 1080, 1082).

In December, 2006, James Talmage, M.D., performed a physical examination and provided a medical source statement "based on [Plaintiff's] back and knee complaints." (Tr. 1521).  Dr. Talmage noted that Plaintiff's gait was normal, and he did not observe that she was using a walker (Tr. 1527).  Plaintiff told Dr. Talmage she uses her electric wheelchair for "longer distance walks" (Tr. 1524).  She also reported doing the laundry with her son's help and doing all of the cooking and cleaning (Tr. 1526).  Dr. Talmage noted that although Plaintiff claimed she could sit for only ten minutes at a time, she sat without back support and without using her hands for support for 45 minutes during the examination (Tr. 1526).  Plaintiff found manipulation of her patella to be painful only after she was aware Dr. Talmage was performing a test (Tr. 1527).  Lumbar posture was normal, but lumbar motion could not be measured because it decreased with each effort (Tr. 1528).  Dr. Talmage noted that a recent lumbar MRI showed "only age-appropriate degenerative changes."

(Tr. 1529). He opined that Plaintiff's self-described activity tolerances were not valid due to symptom magnification (Tr. 1530). Neither the physical exam nor objective testing showed a "pathophysiologic correlate" to Plaintiff's chief complaints of back and knee pain (Tr. 1530-31). Dr. Talmage opined Plaintiff was not limited in her ability to lift, carry, stand, walk, or sit, and she had no postural limitations, either (Tr. 1518-19).

### 2. Mental Assessments

In September, 2004, Mary Kay Matthews, L.P.E., performed a consultative mental examination (Tr. 1083-91). Ms. Matthews reported that Plaintiff was "in an evasive mood," and questions were asked two or three times before Plaintiff answered them (Tr. 1083). Plaintiff's reported symptoms were consistent with adjustment disorder with mixed anxiety and depressed mood (Tr. 1085), but Plaintiff was "not considered to be a credible source of information." (Tr. 1088). Ms. Matthews believed "she skewed the information she provided in an attempt to maximize her problems." (*Id.*). Still, Ms. Matthews considered her findings valid, and opined that Plaintiff had no limitations in her ability to understand and follow simple or detailed instructions or in relating to supervisors or co-workers (Tr. 1090-91).

In April, 2004, Plaintiff's mental health provider completed a functional assessment in which Plaintiff was found to have moderate limitations in each of four functional areas. She had "frequent problems" with activities of daily living, moderate limitations in interpersonal functioning (consisting of "social isolation and withdrawal"), "frequent problems with concentration," and "significant problems" adapting to change (Tr. 1133-34). Plaintiff was classified as a "person[] with severe and persistent mental illness" (Tr. 1135). Her functional assessment improved somewhat in March, 2006, when she was classified as a "person[] with severe illness," although her limitations

in each functional area were still rated as "moderate" (Tr. 1341-43). Her assessment improved further in February, 2007 (Tr. 1616-18). Her limitations in activities of daily living and interpersonal functioning were rated as mild, but her limitations in concentration and ability to adapt to change remained "moderate" (Tr. 1616-17). She was classified as a "person[] who [was] severely impaired" (Tr. 1618).

###    C.    Hearing Testimony

At the first hearing, in January, 2002, Plaintiff described her impairments to the ALJ (Tr. 1905-08). Her chief complaints were back pain and carpal tunnel syndrome, but she also mentioned that her knees would "lock up" on occasion (Tr. 1906). Plaintiff stated she had looked for jobs, but employers would not hire her because of her carpal tunnel syndrome (Tr. 1913-14). Plaintiff testified she was able to drive, but it was painful to drive or ride in a car (Tr. 1901). She also testified she had trouble with the dishes and with cooking (Tr. 1905).

At the November, 2004, hearing, Plaintiff again described her impairments, with an emphasis on back pain and depression (Tr. 1868-73). Plaintiff described her back pain as "above a ten" on a ten-point scale and stated that the pain forced her to lie down for an extended period three or four times per week (Tr. 1877-78). She reported taking pain medicine, which she claimed made her sleepy (Tr. 1878, 1880). Plaintiff stated she shops for groceries with her brother's help; he drives her to the store and carries the groceries (Tr. 1874). She reported she could sit for about an hour at a time before needing to move around and could walk for about half a block without a break, but she could lift "hardly anything" (Tr. 1876-77). She stated she did not ever ambulate without her walker or electric wheelchair, and even with the walker she would sometimes fall after standing for 15 or 30 minutes (Tr. 1878-79, 1887-88).

Plaintiff's testimony at the June, 2007, hearing covered much the same ground. She stated she had to lie down daily for back pain (Tr. 1843). She also testified she could not open a bag of chips without scissors, and she could not lift a gallon of milk (Tr. 1844-45). Plaintiff stated she had been told she suffered from fibromyalgia (Tr. 1852). Plaintiff's attorney brought her son to testify about Plaintiff's daily activities, but the ALJ did not want to take testimony from a minor and instead elected to "assume" that her son's testimony would corroborate her own (Tr. 1853-54).

A VE testified that if Plaintiff were limited to sedentary work with some environmental and postural limitations and if she were required to use a walker, she would still be able to perform jobs such as charge account clerk, addresser, and surveillance system operator monitor (Tr. 1856). If Plaintiff were unable to use her hands more than occasionally during the day, she would be unable to perform "practically all of the sedentary" jobs (Tr. 1857). In addition, if Plaintiff needed to lie down one or more times per day, she would be unable to perform even sedentary work (Tr. 1857-58). The ALJ took "judicial notice" that if a person's medications make her drowsy so that she falls asleep on the job, she would not be able to keep a job (Tr. 1858). He also took judicial notice that if a person were able to stand less than two hours and sit less than six hours during an eight-hour day, as Dr. Schwartz opined was true of Plaintiff, she would be unable to work a full workday (Tr. 1858-59). Finally, with respect to mental limitations, if Plaintiff had "marked" limitations in her ability to deal with work stresses, "[t]here would be no jobs" (Tr. 1857).

## IV.     ANALYSIS

As noted above, Plaintiff challenges the ALJ's decision on three grounds: (1) that he should have found she had a "severe" mental impairment, (2) that he improperly weighed the medical opinions by discounting the opinions of Plaintiff's treating physicians and leaning too heavily on

the opinion of a consultative examiner, and (3) that he erred in finding her testimony was not credible.[9]

## A.    Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence.  42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted).   If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971).  The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387.  The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court is under no obligation to scour the record for errors not identified by the claimant,

---

[9] Plaintiff also makes a step-five argument--viz., that the VE's testimony was based on an inaccurate hypothetical.  That argument is merely derivative of the others, however.

*Howington v. Astrue*, 2009 WL 2579620, *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived). Nonetheless, the court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

### B.    Severe Mental Impairment

Plaintiff argues the ALJ erred by finding she had no severe mental impairment. The SSA determines eligibility for disability benefits by following a five-step sequential evaluation process, described above. 20 C.F.R. § 404.1520(a)(4)(i-v). Step two of that process requires the Commissioner to identify all "severe" impairments. *Id.* § 404.1520(a)(4)(ii). Severe impairments are defined negatively: an impairment is *not* severe "if it does not significantly limit the claimant's physical or mental ability to do basic work activities" such as "[u]nderstanding, carrying out, and remembering simple instructions; . . . [r]esponding appropriately to supervision, co-workers, and usual work situations; [or] . . . [d]ealing with change in a routine work setting." *Id.* § 404.1521(a), (b). The requirement that an impairment "significantly limit" the claimant's abilities should not be read too strictly: "[s]tep two has been described as a *de minimis* hurdle." *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 190 (6th Cir. 2009) (internal quotations omitted). The goal of the test is to screen out only "totally groundless" allegations. *Id.* If the bar were set any higher, the sequential evaluation process would itself violate the statutory standard for determining disability. *Farris v.*

22

*Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985). That is because disability is defined as an inability for 12 or more months to engage in substantial gainful activity, "*considering his age, education, and work experience*." 42 U.S.C. § 423(d) (emphasis added). At step two, however, the Commissioner has not yet accounted for those factors. See 20 C.F.R. § 404.1520(a)(4)(v) (considering those factors at step five). Thus, an impairment can be considered "not severe" only if the impairment is so slight that *no possible claimant,* "regardless of age, education, and experience," could be rendered unable to work because of it. *Simpson*, 344 F. App'x at 190.

A failure to find severe impairments, however, will often be harmless. If the Commissioner finds that the claimant has *any* severe impairments, he is nevertheless required to proceed through the remaining steps of the sequential evaluation with all impairments--both severe and non-severe--in mind. Social Security Ruling ("SSR") 96-8p; *Nejat v. Comm'r of Soc. Sec.*, No. 09-5193, 2009 WL 4981686, at *2 (6th Cir. 2009) (unpublished). Thus, if the ALJ finds a severe impairment and proceeds to the following steps, the claimant usually receives all she could have asked for--an evaluation of how *all* her impairments, both severe and non-severe, affect her ability to work. *See Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 658 (6th Cir. 2009) (error was harmless where ALJ "proceeded to step three, which was all [the claimant] could have asked for").

Here, the ALJ did assess how Plaintiff's mental limitations affected her ability to work at subsequent steps. After concluding she had no severe mental impairment, the ALJ proceeded to assess Plaintiff's RFC, which he then used to make his findings at steps four and five. In fashioning that RFC, the ALJ considered whether Plaintiff's mental limitations affected her functional abilities. He concluded they did not. Specifically, he found that there was no evidence of an underlying

medical condition (i.e., that her alleged mental impairments did not meet the first "prong" of the applicable test) and that Plaintiff's subjective complaints of limitations were not credible (Tr. 24). For that reason, I **CONCLUDE** that the ALJ's error in failing to find a severe mental impairment was harmless.[10]

### C. Weight of Medical Opinions

Plaintiff argues the ALJ should have credited the opinion of her treating physician, Dr. Schwartz, over the opinion of Dr. Pinga, the consultative examiner. Dr. Schwartz opined, in part, that Plaintiff could sit less than six hours and stand or walk less than two hours. If the ALJ erred by not adopting this opinion, such an error could not have been harmless because, as the ALJ recognized, a person who cannot work a full eight-hour day is incapable of performing substantial gainful activity (Tr. 1858-59).[11] *See* SSR 96-8p, n.2 (explaining that a claimant's RFC must be based on what she can do on a "regular and continuing basis"--i.e., eight hours per day, five days per week--unless the finding of nondisability is based on the claimant's ability to perform past, part-

---

[10] Although this finding of harmlessness is dispositive of the issue, I **FIND** that the ALJ erred in failing to find a severe mental impairment. At step two, the ALJ relied solely on the assessment of a single consultative examiner in September, 2004, who opined that Plaintiff was not functionally limited by her mental impairments (Tr. 23, 1087). Plaintiff had been diagnosed, however, with a "severe" depression for which she had received extensive treatment with medication and counseling. Moreover, her mental health provider characterized her depression as "recurrent," and the single snapshot by the consultative examiner in September, 2004, does not overcome that diagnosis, at least for purposes of the low step-two bar.

[11] Plaintiff focuses on Dr. Schwartz's opinion, but also notes that Dr. McCombs opined Plaintiff could sit less than six hours in a day (Tr. 287). Dr. McCombs, however, also stated Plaintiff could stand for *at least* two hours in a day, and his assessment therefore does not show Plaintiff was incapable of working a full day. Dr. McCombs assessment is not otherwise inconsistent with the ALJ's ultimate RFC finding and it was not rejected, so the failure to address it was not error.

In addition, Plaintiff argues that the ALJ failed to consider the opinion of Dr. Roth that Plaintiff "certainly qualifies for disability." That conclusion, however, is reserved for the Commissioner. *See Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 475 (6th Cir. 2008).

time work).

The law governing the weight to be given to a treating physician's opinion is well settled. A treating physician's opinion is entitled to complete deference if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6thCir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original). Even if the ALJ determines that the treating source's opinion is not entitled to controlling weight, the opinion is still entitled to substantial deference commensurate with "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." 20 C.F.R. § 404.1527(d)(2); SSR 96-2p; *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 192 (6th Cir. 2009). When the ALJ rejects a treating source's opinion, he "must provide 'good reasons' . . . , 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers*, 486 F.3d at 242 (quoting SSR 96-7p).

As an initial matter, Dr. Schwartz's opinion is not consistent with other functional assessments in the record, including Dr. Pinga's, and it is therefore not entitled to controlling weight. Nevertheless, the ALJ was still required to offer good reasons for rejecting it. The ALJ explained that Dr. Schwartz's opinion was offered in September, 2002, only seven months after Plaintiff's right knee surgery, and Dr. Schwartz's records suggested that her condition was "still improving." (Tr. 25). Furthermore, the ALJ cited evidence purportedly showing that Plaintiff engaged in activities inconsistent with her alleged limitations after Dr. Schwartz offered his opinion (*id.*). To

the extent that Dr. Schwartz's opinion rested on Plaintiff's knee impairments, the ALJ observed that Plaintiff's recent treatment focused on back pain rather than knee pain (*id.*). Finally, the ALJ observed that the objective evidence--x-rays and MRIs--failed to show severe knee abnormalities or anything worse than mild degenerative disc disease (*id.*).

Plaintiff challenges several of these reasons, chiefly the ALJ's statement that Dr. Schwartz suggested Plaintiff's condition was still improving and the purported evidence of activities inconsistent with Plaintiff's claimed limitations. It is not necessary to address those arguments, however, because the lack of objective evidence is reason enough to reject Dr. Schwartz's opinion. *See Millmine v. Sec'y of Health & Human Servs.*, 69 F.3d 537, 1995 WL 641300, at *1 (6th Cir. 1995) (Table) (finding good reason to reject a treating physician's opinion where other physicians failed to confirm it and there was no objective evidence to support it). Plaintiff's persistent complaints of pain occasioned frequent testing, but her recent tests showed, at most, "mild" knee or back impairments (e.g., Tr. 1443-44, 1516-17, 1563). In light of the other examining physicians' more recent and less restrictive assessments based on those same "mild" impairments, I **FIND** the ALJ had "good reason" to afford Dr. Schwartz's opinion less weight.

Plaintiff also argues the ALJ gave too much weight to Dr. Pinga's assessment. In his narrative assessment, Dr. Pinga opined Plaintiff could sit six hours and stand/walk four hours, with a walker, during an eight-hour day (Tr. 1077). On a checklist form, however, he opined Plaintiff could stand or walk about six hours (Tr. 1079). Plaintiff makes much of this discrepancy, and argues Dr. Pinga's report was so "inadequate or incomplete" that it should not have been given significant weight. *See* 20 C.F.R. § 404.1519p (describing when the ALJ should contact a medical source for missing information or a revised report). The ALJ however, discussed the discrepancies

between Dr. Pinga's narrative and checklist assessments at length. He found that, although the discrepancies limited the weight of either assessment alone, they were nonetheless entitled to significant weight when taken together (Tr. 25). I **FIND** his conclusion in that regard was supported by substantial evidence. As the ALJ noted, there is considerable "overlap" between the assessments. Both assessments, for example, made specific mention of Plaintiff's use of a walker (Tr. 1077, 1079). Simply put, Dr. Pinga's assessments do not show a carelessness that would make his opinions suspect. In fact, Dr. Pinga's report is the most extensive, methodical discussion of Plaintiff's medical history and impairments that appears in the entire record. I **CONCLUDE** the ALJ did not err in the weight he gave the opinions of any medical sources, including Drs. Schwartz and Pinga.

### D. Credibility Determination

Finally, Plaintiff argues the ALJ erred in finding her testimony was not credible. Credibility assessments are properly entrusted to the ALJ, not to the reviewing court, because the ALJ has the opportunity to observe the claimant's demeanor during the hearing. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Where an ALJ's credibility assessment is fully explained and not at odds with uncontradicted evidence in the record, it is entitled to great weight. *King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984) (noting the rule that an ALJ's credibility assessment is entitled to "great weight," but "declin[ing] to give substantial deference to the ALJ's unexplained credibility finding," and holding it was error to reject uncontradicted medical evidence). *See also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009) (ALJ was entitled to "rely on her own reasonable assessment of the record over the claimant's personal testimony"); *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir. 1994)

(ALJ's credibility assessment is entitled to substantial deference).

I **FIND** the ALJ's credibility assessment was supported by substantial evidence. The ALJ found Plaintiff's testimony about her physical impairments was incredible because they "exceed[ed] what could reasonably be expected in light of the objective findings." (Tr. 24). As explained above, those objective findings showed no more than mild impairments of the back and knees. The ALJ further noted that Plaintiff complained she could not perform household chores, but had long been caring for her son and had only recently received outside assistance with housework (*id.*). Similarly, the ALJ found Plaintiff's complaints about the severity of her mental impairments were incredible because Plaintiff frequently cancelled therapy appointments and a consultative examiner believed she was malingering (Tr. 23). Both these observations are amply supported by the record.

Plaintiff argues the ALJ erred as a matter of law by relying solely on the absence of objective evidence to find her complaints of pain were not credible. Regardless of the accuracy of that legal proposition, however, the ALJ did not rely solely on the lack of medical evidence; he also relied on Plaintiff's responsibility in caring for her young son. Finally, Plaintiff argues that the longitudinal record contains evidence supporting her allegations of pain. That may be true, but this Court does not decide whether a claimant is, in fact, credible--a question on which reasonable minds may sometimes differ. Instead, the Court asks only whether the Commissioner's findings are supported by substantial evidence. *See Garner*, 745 F.2d at 387; *Felisky*, 35 F.3d at 1035. I **CONCLUDE** that they are.

## V.     CONCLUSION

Having carefully reviewed the administrative record and the parties' pleadings, I

**RECOMMEND:**[12]

    (1)       Plaintiff's motion for summary judgment [Doc. 17] be **DENIED**.

    (2)       Defendant's motion for summary judgment [Doc. 19] be **GRANTED**.

    (3)       The Commissioner's decision denying benefits be **AFFIRMED** and this action be **DISMISSED WITH PREJUDICE**.


s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[12] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).